## PATTERSON et al. v. BALTIMORE STEAM-PACKET CO.

(District Court, D. Maryland.   November 28, 1899.)

ADMIRALTY JURISDICTION--MARITIME CONTRACT--CONTRACT FOR CARGO SPACE.
  A contract by which a steamship company agrees to furnish cargo space for a foreign shipment of cotton, and the other party agrees to furnish such cotton for shipment on one of the company's vessels sailing late in a certain month, and to pay a stipulated rate of freight for its carriage, is maritime, and an action in personam for its breach is within the jurisdiction of a court of admiralty.[1]

In Admiralty.   On exceptions to libel.
See 101 Fed. 298.

Brown & Brune, for libelants.
Lemmon & Clotworthy, for respondent.

MORRIS, District Judge.   This is a libel in admiralty for breach of an alleged contract of affreightment.   The libel alleges that the libelants are the agents in Baltimore of the Johnston Line of steamers, and of William Johnston & Co., Limited, of Liverpool, England, who manage and control a number of British steamers trading upon the high seas between Baltimore and Liverpool, known as the Johnston Line; that in May, 1898, the Baltimore Steam-Packet Company entered into a maritime contract of affreightment with the libelants for the shipment by said company on a steamer or steamers of the Johnston Line to sail late in June, 1898, of 1,000 bales of cotton, to be transported from Baltimore to Liverpool, and agreeing to pay as freight for such transportation, and compensation for the room or space necessary for said cargo, 26 cents per 100 pounds.   The libel alleges that during the month of June, 1898, several steamers of the Johnston Line sailed from Baltimore to Liverpool, on which the shipment of 1,000 bales of cotton could have been carried if tendered, and the said company was notified of the sailing of the steamers, and of the time when it would be necessary to have the cotton ready for lading, but the company on June 21, 1898, notified the libelants of its inability to furnish the cotton for shipment, and requested the libelants to fill the space contracted for with such other freight as they could procure, and charge the loss which might be sustained to the company.   The libel then alleges that the libelants procured such other cargo as could be obtained, and reduced the loss

---

[1] Admiralty jurisdiction as to matters of contract, see notes to The Richard Winslow, 18 C. C. A. 347; Boutin v. Rudd, 27 C. C. A. 530.

by the breach of the contract to the sum of $627, for which it now sues. To this libel the Baltimore Steam-Packet Company excepts upon the ground that the libel does not set forth a cause of action which is within the admiralty and maritime jurisdiction.

With the libel were filed two exhibits, intended to show specifically the written memoranda of the contract on which the allegations of the libel were based. The first is as follows:

"Engagement No. 244.   Baltimore Steam-Packet Co. (Bay Line).

"Norfolk, Va., May 19th, 1898.

"Dear Sir:   We have this day booked with you, via Johnston Line, from Baltimore to Liverpool, 1,000 bales cotton, at ocean rates,—26 cents per 100 pounds.   Sailing about late in June, 1898.

"Respectfully,                                    William Randall, Agent.

"To Mess. Paterson, Ramsay & Co., Balto., Md."

And the other exhibits are a telegram and a letter, both dated June 21, 1898, from the exceptant, stating that the Seaboard Air Line say it is impossible to secure the cotton to fill the room contracted for by engagement No. 244, and asking the libelants to do the best they can with other freight, and charge the exceptant with the loss.

It is urged on behalf of the exceptant that the contract was not a maritime contract, but was a contract merely preliminary and leading to a maritime contract, and therefore not of admiralty cognizance. It is true that when the goods are actually put on board the ship a bill of lading is customarily given, which sets forth with particularity the stipulations of the contract of affreightment. But a bill of lading is not necessary. Ben. Adm. (3d Ed.) § 286. In this case there was, if the allegations of the libel be true, a concluded agreement that the exceptant, on the one hand, would be furnished space on a steamer or steamers of the Johnston Line sailing late in June, 1898, for 1,000 bales of cotton, from Baltimore to Liverpool, and, on the other hand, that the exceptant would ship the cotton, and pay 26 cents per 100 pounds freight. Is this not a final contract for a purely maritime service? If the ship or ships were named, I think it could not be questioned. Does the fact that, instead of a named vessel, the engagement is for a vessel or vessels of an established line of steamers, sailing regularly from the port, and made with the agents known to be acting for those steamers, alter the nature of the contract or the service? Mr. Justice Story, in The Volunteer, 1 Sumn. 551–553, Fed. Cas. No. 16,991, thus states the nature and extent of the jurisdiction of the admiralty over maritime contracts:

"The admiralty had an original, ancient, and rightful jurisdiction over all maritime contracts, strictly so called (that is, such contracts as respect business, trade, and navigation to, on, and over the high seas), which it might exert by a proceeding in rem in all cases where the maritime law established a lien or other right in rem, and by a proceeding in personam where no such lien or other right in rem existed."

Whether the contract is maritime or not depends solely upon the subject-matter and nature of the service to be performed, and re-

sults from the contract itself, and not from the performance of it. The Pacific, 1 Blatchf. 587, Fed. Cas. No. 10,643.

In Moorewood v. Enequist, 23 How. 491-493, 16 L. Ed. 516, the supreme court, speaking of the case of New Jersey Steam-Nav. Co. v. Merchants' Bank, 6 How. 344, 12 L. Ed. 465, said:

"We then decided that charter parties and contracts of affreightment are maritime contracts, within the meaning of the constitution and act of congress, and cognizable in courts of admiralty by process in rem or in personam."

And in Insurance Co. v. Dunham, 11 Wall. 1-11, 20 L. Ed. 90, the rule is thus stated by Mr. Justice Bradley:

"Secondly, as to contracts, it has been equally settled that the English rule, which concedes jurisdiction, with a few exceptions, only to contracts made upon the sea, and to be executed thereon (making locality the test), is entirely inadmissible, and that the true criterion is in the nature and subject-matter of the contract, as whether it was a maritime contract having reference to maritime service or maritime transactions."

And it was held in that case that the contract of maritime insurance is a maritime contract, and within the admiralty and maritime jurisdiction.

Among other considerations leading the supreme court to that decision, reference was made to the fact that the rights of the parties arising from a contract of marine insurance are mixed up with all the questions that can arise in maritime commerce, and so it may be with regard to a contract for transportation by vessels upon the high sea.

The only distinction in substance between the contract in this case and a charter party, which is a contract of undisputed admiralty cognizance (Davison v. Von Lingen, 113 U. S. 40, 5 Sup. Ct. 346, 28 L. Ed. 885), is that in a charter party the vessel is named, while in this case the vessels of a particular ocean-going line of steamers, sailing during the latter part of a designated month, are stipulated for. All the cases cited by the learned counsel for the exceptant in their able brief are cases in which the proceeding has been in rem. and the rule has been enforced that purely executory contracts do not give any privilege or lien against the ship. They are none of them cases in personam. I hold that the breach of the contract alleged in the libel gives rise to an action in personam cognizable in the admiralty, and I overrule the exception.